*Bennington,*
February,
1824.

GRAVES and BURTON, Executors of ASAPH SHELDON,

*vs.*

INCREASE SHELDON et al. Heirs of ASAPH SHELDON.

An alteration in the circumstances of a devisor after the execution of his will, will not in any case amount to a revocation in law.

If a part of the estate devised be conveyed by the testator, it is a revocation of the will *pro tanto* only.

If a devisor convey the whole of the estate devised, it is of necessity a total revocation of the will; and the plain sense of the statute of this State respecting wills and testaments is, that there shall be no implied revocations of wills and testaments except such as result *ex necessitate rei.*

THE statement of this case will clearly appear from the opinion of the Court delivered by

AIKENS J.—This is an appeal taken by the heirs at law of Asaph Sheldon, deceased, from a decree of the Probate Court for the District of Manchester, approving his last will and testament.

An objection was taken, on the hearing, to the legality of the allowance of the appeal. The arguments urged on this point would have been properly addressed to this Court on the occasion of the allowance; and no doubt were then urged and duly considered. Finding the cause on the docket, and the appeal to have been allowed on petition of the heirs, at the last term of the Court, I consider that point as *res judicata,* and do not feel myself at liberty to review it.

It appears from the will itself, which bears date the 7th of March, 1816, that the testator, being then a widower, and owning two farms, one of which he denominated his " home farm," and the other the " mountain farm," and being possessed also of some considerable personal estate, after directing his just debts and funeral charges to be paid out of his personal estate, bequeathed the remainder of his property as follows:

Secondly.—I give to the natural heirs of my adopted daughter Sylvia, wife of Rix Kinne, of her own body begotten, the home farm on which I now live, being the farm purchased of the Rev. Increase Graves, together with about eight acres lying on the west end of said farm, with all the buildings and appurtenances thereto belonging. Also, I give to the said heirs of my said adopted daugh-

Bennington,
February,
1824.

Graves and
Burton
vs.
Sheldon
et al.

ter, all and singular of my personal estate and household furniture, and the wearing apparel of my wife Abiah, late deceased, (above what is necessary to pay my just debts and funeral charges) excepting only my own wearing apparel. And I do hereby order, that all and singular of the above described property, both real and personal, shall, at my decease, come into the hands of my executors hereinafter named, and by them to be used for the necessary maintenance and education of the said heirs of my said adopted daughter during their minority, and also to allow, from time to time, to my said adopted daughter Sylvia, out of the above described property, so much as shall be necessary for her maintenance during the minority of her said heirs. And when the said heirs of the said adopted daughter shall become of full age, what shall then remain unexpended of the above described property, shall be equally divided between them, their heirs and assigns forever.

Thirdly.—I give to my nephew, Asaph Sheldon 2d, son of Ezra Sheldon, the farm where I formerly lived, called the mountain farm, and all my wearing apparel, to be his and his heirs and assigns at my decease.

He then proceeded to nominate the appellees executors to the will, and revoke all other wills by him made.

It was admitted that the will was freely executed, and that the testator was of sound and disposing mind at the time.

The heirs now appear and show cause against the affirmance of said decree, and for cause say, That since the signing and publishing of the said will, the said Asaph in his life-time revoked the same as his last will, testament and devise, and has sold, conveyed, and alienated all the real and personal estate therein mentioned, to wit, at Rupert, on the 1st day of January, 1821, which they offer to verify.

In support of this allegation they have proved the following facts :—

1st.—That on the 1st of April, 1817, the testator sold and conveyed the mountain farm to two men by the name of Farrer, for the consideration of $1700.

2d.—That on the 9th of June, 1817, he entered into a written contract with Olive Spencer, in contemplation of marriage with her, in which he secures to her the absolute use, control and dis-

position of her own property, and also covenants that she shall at all times, both in sickness and health, be entitled to a full support and maintenance, out of *his* estate, during her natural life, without using any thing in her support that was hers before her intermarriage with him; but that all her wants are to rest on him, and on his estate. Which maintenance she agrees to accept of him in dower, in case she should survive him. That the contemplated marriage was afterwards solemnized, and that she did survive him.

*Bennington,*
*February,*
*1824*

Graves and
Burton
*vs.*
Sheldon
et al.

3d.—That in the course of the year 1818, he addressed three several letters to his nephew, Asaph Sheldon 2d, who was then residing at Adams, in the State of New-York, in which he states in substance, that he is old and in trouble, having nobody to carry on his farm, and urges his nephew with great earnestness to break up at Adams, and come and live with him and take care of him—represents to his nephew that he will secure to him the one half of the home farm, which he states is worth $3000. That if the one half is not enough, he shall have more. Desires his nephew to sell off his wooden ware—says that he has a plenty of beds and bedsteads and iron ware, and that he should have of them. That in consequence of these repeated requests and proposals, his nephew did come and reside with him.

4th.—An indenture of lease and conditional sale, executed between the testator and his nephew, dated the 21st of January, 1819, by which he demises to his nephew the one half of the home farm, forever, and the other half, during the natural lives of himself and of his wife Olive, and the life of the survivor of them; for the consideration and upon the condition, that his nephew shall well support them and each of them during their respective lives. The lease to become void on a failure to comply with this condition. It is mutually covenanted in this lease, among many other things, that on the decease of the survivor of Asaph Sheldon the 1st, (the testator) and his wife Olive, the nephew shall render peaceable possession of that half of the farm which is leased for their lives, to the legal executor or administrator to the estate of the said Asaph the 1st, *that it may be appropriated to the use and benefit of the heirs of the said Asaph the 1st.*

5th.—A receipt dated April 19, 1821, executed by Nathan Burton, who is one of the executors named in the will, to the testator,

Bennington,
February,
1824.

Graves and
Burton
vs.
Sheldon
et al.

for two notes of hand of $100 each, (being part of the avails of the " mountain farm ") expressed to have been received to collect and to appropriate, at the discretion of Burton, for the purpose of furnishing necessary clothing and education to the children of Sylvia Kinne, as they shall stand in need ; the same, or the unexpended balance thereof, liable however to be recalled from his hands by the said Sheldon at any time during his life, if he should see fit.

And the question is, whether these several acts of the testator do in law amount to a revocation of the will *in toto*, or not.

In deciding this question, I have looked into the authorities cited on the hearing, as well as many others, and have regarded with no small attention the nice distinctions of artificial reasoning and technical disquisition, with which they abound.   I confess I have not derived that aid from the examination which I anticipated.

Revocations at common law were either express or implied— the latter are termed revocations in law, and might be effected in two ways.—1st, by a total alteration in the circumstances of the devisor.—2dly, by an actual or intended alteration in his estate.

I will here remark, that in England, a distinction is taken between those facts which may amount to an implied revocation at law, and in chancery.   No such distinction is admissible here. The Judges of the Supreme Court are *ex officio* the Judges of the Court of Chancery.   Appeals from the Probate Court are directed to be carried to the law side of this Court.   And it would be ridiculous to thrust a party from that side of the Court to which the statute has sent him for justice, and at the same time tell him, that if he will approach us on the *other* side, he shall receive it !

The statute of this State respecting the revocations of wills and testaments, under which this question must be decided, is a literal transcript of the 6th section of the 29 Car. II.   The construction of this clause of the statute in England has been, that it leaves revocations by conclusion and operation of the law in the same state in which it found them.   This construction obviously renders the important provisions of the section in relation to revocations, altogether nugatory, except as to a particular mode of effecting an express revocation ; whereas, the plain sense of the statute is, that *no* revocation, except such as reverts *ex necessitate rei*, shall be effected otherwise than expressly, and that too in one of the modes

therein pointed out. I am not prepared to go the length of the English decisions, as reported, on this subject. I feel bound to construe every constitutional act of the Legislature, in such manner as to give it full and complete effect. For certainly, the constitutional statutes of this State are not to be anuulled on the authority of any Court. I cannot admit that an alteration in the circumstances of the devisor will in any case amount to a revocation in law ; or that an *intended* alteration in his estate, will have that effect. It is true, that the *intention* of the testator is to be principally regarded ; but that intention is to be inferred from such facts only, as the statute authorizes us to notice.

But to proceed on principles independent of positive regulations Does the fact of a change in a man's circumstances afford a stronger presumption of an alteration of his intentions, than the fact of his preserving his will unaltered and unrevoked does of his intentions remaining the same? I confess I am unable to see it in that light. The statute has secured the rights of widows unprovided for, and of posthumous children. The necessity of the rule, if it exist in England, is thus far obviated here. The only implied revocations therefore, known to the laws of this State, are such as result *ex necessitate rei*. It is said by Justice Buller, in his argument in the case of Goodtitle *v.* Otway, (1 Bos. and Pul. 615) that there is not a maxim in our law better established than this, that *all* implications are *ex necessitate*. That upon any other ground they would be capricious and arbitrary. *Such* a revocation may be either *total* or partial. If A. devise all his estate to B. and afterwards alienate the whole to C. it is necessarily a total revocation ; for there is nothing for the will to operate upon. If he devise black-acre to B. and white-acre to C. and afterwards dispose of black-acre, it is a revocation *pro tanto*.

Revocations *pro tanto* may operate either by altering the *quality* of the estate in abridging the interest in, or diminishing the *quantity* of the thing devised.

And the rule is the same in relation to personal estate. If a tenant in common devise, and afterwards make partition, the devise shall nevertheless stand. (T. Ray. 240. 3 P. Will. 170.) So, if one seized of the entirety devise, and afterwards alienate an undivided moiety ; for in both instances, the testator dies seized

*Bennington,*
*February,*
*1824.*

Graves and
Burton
*vs.*
Sheldon
et al.

*Bennington,*
February,
1824.

Graves and
Burton
*vs.*
Sheldon
et al. of the *old estate*, which he possessed at the time of the devise. It is not another and different estate acquired in the same premises by a purchase subsequent to the devise.

The case last put is precisely the case now in judgment. The perpetual lease of one half of the home farm to Asaph Sheldon 2d, operates *ex necessitate rei* as a revocation of the will *pro tanto*. And the lease of the other half, during the life of the *survivor* of the testator and his wife, has the same effect—*quo ad* the term. (Cro. Car. 23. Cro. Jac. 49.) Even a mortgage in fee, is, at this day, regarded only as a *charge* upon the devise, and consequently only a revocation *pro tanto*. (1 Vern. 329. 2 Ch. R. 154. 2 Ld. Ray. 968.)

It was contended in the argument that the covenant in the lease above recited, is an absolute conveyance of the remainder of the devise, after the expiration of the life-lease to the heirs of the testator ; and that therefore, there was nothing left for the devise to operate upon. This is inadmissible. A man cannot legally convey his estate to his *heirs generally,* by deed, to take effect after his decease. If such an instrument could have any effect at all, it must be that of a devise. But the instrument in question has not the legal requisites to give it validity in that character. To permit it to take effect *as a deed,* would be in violation of that most wholesome and equitable provision of the statute, which gives to the creditor of a deceased person a lien upon his estate in the hands of his executors or administrators. This instrument is a *writing signed by the testator*, and is certainly expressive of an intention that the estate should pass to his heirs, instead of the devisees. But it cannot operate as an express revocation of the will. It was *not* executed with the legal formalities which the statute expressly requires in order to give it that effect.

After what has been observed, it is unnecessary to comment on the other facts in the case. I am therefore of opinion, that the facts exhibited in evidence by the appellants do not, in law, amount to a total revocation of the will. It may be proper to remark also, that this result appears to be in conformity to the principle of law as expressed by this Court in 1819, in the case of Parkhill *v.* Parkhill. (Bray. 239.)

The judgment of the Court is, that the decree of the Probate Bennington, February, 1824. Court for the District of Manchester, approving the last will and testament of Asaph Sheldon of Rupert, deceased, be affirmed; and that the appellees recover their costs.